JODI LINKER, Bar No. 230273
Federal Public Defender
Northern District of California
MARA K. GOLDMAN, Bar No. 181791
DEJAN M. GANTAR, Bar No. 306929
Assistant Federal Public Defenders
55 South Market Street
San Jose, CA 95113
Telephone:  (408) 291-7753
Facsimile:  (408) 291-7399
Email:  Mara_Goldman@fd.org

Counsel for Defendant RILEY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AMANDA RILEY, <br><br> Defendant. | Case No. CR 21–00004 BLF <br><br> **REPLY RE: MOTION FOR SENTENCE REDUCTION** |

## INTRODUCTION

The government argues that Amanda Riley should be denied a sentence reduction because, in its opinion, she is just pretending to be sick. Yet her medical records—including those submitted as exhibits by the government—extensively document her ongoing medical conditions. The government urges the Court to ignore this objective medical evidence because doctors have attributed some of Ms. Riley's medical problems to factitious disorder. Assuming that this diagnosis is correct, Ms. Riley suffers from an extremely serious disorder that the Bureau of Prisons (BOP) has failed to treat. And even if Ms. Riley suffers from factitious disorder, this does not change the fact that she also suffers from several other long-term medical conditions. The only way to ensure that Ms. Riley receives the necessary medical and psychiatric care is to reduce her sentence to time served.

Alternatively, the Court should reduce Ms. Riley's sentence to 47 months pursuant to Amendment 821. Probation recommends a reduction and the government concedes that Ms. Riley is eligible for one. When the Court sentenced Ms. Riley, her advisory guideline range was 12-18 months. The Court varied upward to 60 months, an increase of approximately 233%. Accordingly, the Court should reduce Ms. Riley's sentence to 47 months, which represents a 233% increase from Ms. Riley's amended guideline range of 8-14 months.

## ARGUMENT

**I.     Extraordinary and compelling reasons justify a sentence reduction.**

Extraordinary and compelling reasons for release exist when the BOP's failure to provide "long-term or specialized medical care" puts an inmate "at risk of serious deterioration in health or death." USSG § 1B1.13(b)(1)(C). The government contends that Ms. Riley cannot satisfy this requirement because, in its opinion, there is nothing wrong with her. The government argues that Ms. Riley's medical conditions are "poorly documented," Govt. Opp. at 4:17-18; that "she does not actually suffer from any acute health problems at all," *id.* at 5:3-4; and that "[t]hese medical conditions—even if they existed—would be neither extraordinary nor compelling," *id.* at 4:19. All of these assertions are belied by her medical records.

**A.     Ms. Riley's medical conditions are extensively documented.**

As an initial matter, the government fails to explain why, if Ms. Riley has no "real" health problems, she has medical hold that prevents her from going to the satellite camp, or why the BOP has consistently designated her as a Care Level 3 inmate, a designation reserved for inmates with "complex, and usually chronic, medical or mental health conditions." BOP Clinical Practice Guidance, *Care Level Classification for Medical and Mental Health Conditions or Disabilities* (May 2019) 3, https://www.bop/gov/resources/pdfs/care_level_classification_guide.pdf.

Even before she went into custody, Ms. Riley was "in poor health and suffer[in] from numerous medical conditions." PSR ¶ 64. These conditions were documented in her Presentence Report. PSR ¶¶ 64-68. Since entering custody, these conditions have worsened, which is extensively documented in the medical records that comprise the government's own exhibits. These records reflect that she suffers from multiple "active problems," including supraventricular tachycardia,

1  anxiety, leukemoid reaction, electrolyte imbalance, and postural orthostatic tachycardia syndrome.
2  Govt. Exh. 12 at US-2024-003052. Her lab test results consistently show multiple abnormal values.
3  *See, e.g.,* Govt. Exh. 5 at US-2024-001173-75; Govt. Exh. 7 at US-2024-002911-12; Govt. Exh. 9 at
4  US-2024-002854-55; Govt. Exh. 10 at US-2024-003077-78; Govt. Exh. 13 at US-2024-000928-30;
5  Govt. Exh. 14 at US-2024-003063-65; Govt. Exh. 15 at US-2024-001319-22. According to the ER
6  doctors, her labs are "concerning for severe hypolakemia, hypomagnesemia and hypophosphatemia,"
7  Govt. Exh. 4 at US-2024-002995; and indicate that Ms. Riley is "high risk for life threatening
8  condition due to chest pain, sinus tachycardia," Govt. Exh. 7 at US-2024-002909.

9        Faced with objective evidence of these medical conditions, the government seeks to minimize
10 them by suggesting that Ms. Riley is intentionally causing her symptoms. *See* Govt. Opp. at 5:6-27.
11 In support of this allegation, the government relies on three pages of medical records out of the
12 several thousand pages the government has produced in discovery. The first page contains an
13 assertion from Dr. Bryant during her April 17, 2023 emergency room visit that "[o]bviously the
14 patient has distressed her body to create tachycardia." Govt. Exh. 2 at US-2024-003070. Dr. Bryant
15 does not explain how Ms. Riley accomplished this nor is there any explanation apparent from the
16 record; the only basis for Dr. Bryant's "obvious" conclusion appears to be "the information that [he]
17 uncovered" while searching the internet search for information about Ms. Riley's conviction. *See id.*
18 at US-2024-003070-71. The second page contains a nurse's accusation that, during the same April
19 17, 2023 emergency room visit, Ms. Riley was "holding her breath," although this supposed conduct
20 does not appear to have had any effect on her test results. *See* Govt. Exh. 3 at US-2024-002051. The
21 third page contains an assertion from Dr. Bryant that during an earlier visit, i.e., the April 17, 2023
22 visit, "the patient was found manipulating the pump for potassium." Govt. Exh. 4 at US-2024-
23 002994. It appears that this refers to an incident where Ms. Riley tried to pause the potassium pump
24 because it was burning. The nurse explained to Ms. Riley that touching the pump while it is running
25 is dangerous and told her that in the future she should ask for help. Govt. Exh. 3 at US-2024-002051.
26 The nurse's note does not refer to "manipulating" or contain any suggestion that Ms. Riley was trying
27 to interfere with her treatment. *See id.* Even if these incidents, all of which purportedly occurred
28 during a single hospital visit, are viewed in the worst possible light, they cannot explain away Ms.

Riley's multiple, ongoing medical problems.

### B.     If, as the government asserts, Ms. Riley suffers from factitious disorder, she has a serious, potentially deadly, condition that the BOP has done nothing to address.

As the government notes, multiple doctors have opined that Ms. Riley's symptoms are the result of factitious disorder. *See* Govt. Opp. at 6:1-16. This is perhaps unsurprising given the easily accessed public information about her conviction. Assuming, however, that this diagnosis is correct, Ms. Riley is suffering from "a serious mental health disorder" whose complications can include "injury or death from self-inflicted medical conditions," "severe health problems from infections," and "loss of organs or limbs from unnecessary surgery." Mayo Clinic, *Factitious Disorder*, https://www.mayoclinic.org/diseases-conditions/factitious-disorder/symptoms-causes/syc-20356028?p+1; *see also* Akriti Sinha & Trenton Smolik, "Stiving to Die: Medical, Legal, and Ethical Dilemmas Behind Factitious Disorder, *Cureus* (Feb. 9, 2021), attached hereto as Exhibit X. "[N]umerous deaths from this condition have been reported while more go unrecognized and unreported." *Id.* Even when people with factitious disorder recognize "the risk of injury or even death as a result of self-harm or the treatment they seek," they continue on this dangerous course because "*they can't control their behaviors*." Mayo Clinic, *supra* (emphasis added).

The primary treatments for factitious disorder are psychotherapy and cognitive-behavioral therapy. *See* Cleveland Clinic, *Factitious Disorders: Symptoms, Causes, Diagnosis, and Treatment*, https://my.clevelandclinic.org/health/diseases/9832-an-overview-of-factitiousdisorders#management-and-treatment. Yet nowhere in Ms. Riley's thousands of pages of medical records is there any indication that she has received psychotherapy, cognitive-behavioral therapy, or any other form of therapy for factitious disorder or for her other diagnosed mental health conditions, which include Major Depressive Disorder, Anxiety, Unspecified Mood Disorder, and Post Traumatic Stress Disorder. *See* PSR ¶¶ 67-68; Defense Exh. R at US-2023-000985. Instead, her few contacts with psychiatrists have been limited to prescription reviews. In light of the possibility that Ms. Riley suffers from such a serious disorder, the government's insistence on a sentence considerably higher than its original recommendation is striking for its cavalier approach to mental health conditions.

**C.  Regardless of whether Ms. Riley has factitious disorder, this diagnosis prevents her from receiving necessary treatment for her other medical conditions.**

Whether or not Ms. Riley suffers from factitious disorder, the assumption that she does has impeded her medical care. Once medical personnel decide that a person has factitious disorder, they tend to approach her with hostility and distrust, resulting in "punitive confrontations" and "missed diagnoses of true medical illnesses." Exh. X, *supra*. This has been particularly true in Ms. Riley's case, where every encounter is colored by her criminal conviction. When Dr. Bryant encountered Ms. Riley, he took it upon himself to "perform[] an Internet search of the patient." Govt. Exh. 2 at US-2024-003071. He found a Department of Justice press release entitled "Woman Formerly of Bay Area Sentenced to Five Years in Prison for Fraud Scheme," which he promptly added to her medical records as a "special note." *Id.* Subsequent medical reports refer back to Dr. Bryant's special note. *See*, *e.g.,* Govt. Exh. 3 at US-2024-002052 ("[P]lease refer to Dr. Bryant's (ED Physician) special note detailing some of patient's medical/criminal history regarding fabricating medical diagnosis for personal gain."); Govt. Exh. 10 at US-2024-003073 (same); Govt. Exh. 11 at US-2024-002047 (same); Govt. Exh. 12 at US-2024-003053 (same); *see also* Govt. Exh. 5 at US-2024-001169 (noting that Ms. Riley is "currently in prison for fraud after collecting funds for faked cancer dx" and referring to "Dr. Bryant's documentation from 4/17/2023 for further details"); *id.* at US-2024-001179 (discussing Ms. Riley's "federal record of fraud after pretending to have cancer").

In short, if Ms. Riley suffers from factitious disorder, the BOP has failed to provide any treatment for this serious condition. And whether she has factitious disorder or not, this label may very well have caused her doctors to dismiss many of her physical symptoms as imaginary or blame her for inducing them. The BOP's failure to provide adequate medical care meets the requirements of both § 1B1.13(b)(1)(C) and § 1B1.13(b)(5).

## II.  The § 3553(a) factors support a reduction.

When Ms. Riley was sentenced, the government recommended an 18-month sentence. *See* ECF 37 at 4. Ms. Riley has already served more time in prison than the government's original recommendation. Moreover, her time in prison is significantly harsher and more punitive than anyone anticipated. Not only has the BOP refused to transfer Ms. Riley to a camp, the appropriate placement for a person with her security designation, but her medical hold makes her ineligible to go to a

halfway house, where she would ordinarily spend the final months of her sentence. *See* 12/7/23 Response to Request for Administrative Remedy # 1184879-F1, attached hereto as Exhibit Y.

The government argues that Ms. Riley should not complain since she requested that she be sent to FMC Carswell. Govt. Opp. at 7:28-8:2. As the transcript of the sentencing hearing makes clear, however, Ms. Riley requested placement at either FCI Bryan or FMC Carswell was because they are the two women's facilities closest to where her children and husband live. *See* Govt. Exh. 1 at 28-29.

The government dismisses as "circular" Ms. Riley's argument that even though she is not receiving adequate medical care at Carswell, the BOP should transfer her to the satellite camp. Govt. Opp. at 7:24-25. In fact, it is the government's argument that is circular: if, as the government insists, Ms. Riley is perfectly healthy, there is no justification for denying her placement in the camp.

The government argues that Ms. Riley offers "no evidence whatsoever" that "conditions at FMC Carswell are restrictive or harsh." Govt. Opp. at 8:2-3. It is self-evident that a minimum security camp is less restrictive than a facility designed to house high-security inmates. Camps have dormitory housing, "limited or no perimeter fencing," and are "work- and program-oriented." BOP, *About Our Facilities*, https://www.bop.gov/about/facilities/federal_prisons.jsp. FMC Carswell, by contrast, is an administrative facility "capable of holding inmates in all security categories." *Id.* This includes inmates with high security designations, meaning that FMC Carswell must have "highly secured perimeters" and "close control of inmate movement." *Id.*

The government claims that Probation's Sentence Reduction Investigation Report (SRIR) shows that Ms. Riley "has made no real effort to pay her restitution to her victims." Govt. Opp. at 8:7-9. This is simply incorrect. This Court ordered Ms. Riley to pay $25 per quarter ($100 per year) while she is in custody. *See* ECF 51 at 7. According to the SRIR, Ms. Riley's restitution payments have far exceeded that amount. In the six months preceding the SRIR, she paid $800—16 times the required payment. *See* SRIR at 3.

The government urges the Court to deny Ms. Riley's motion because "she is determined to continue malingering," "does not appear to have learned anything from her conviction," and "continues to pose a danger to the community." Govt. Opp. at 8:6-10. The government claims its argument is based on the SRIR, *see id.* at 8:10, but the SRIR says nothing of the kind. Far from

accusing Ms. Riley of "malingering," the SRIR reports that her "medical classification is a Care Level 3, which is described as 'unstable' with 'complex chronic care.'" SRIR at 3. Its discussion of her post-sentencing conduct is also positive; in addition to noting her restitution payments, the SRIR notes that Ms. Riley "has maintained clear conduct since her incarceration with no disciplinary incidents," that she has taken numerous classes, and that she is working as an orderly. *See id.*

In her motion, Ms. Riley argued that she is unlikely to pose any future danger to the community because her case has received widespread media attention. The ease with which people can find information about her conviction is evident from Dr. Bryant's internet search. Far from fading over time, the publicity surrounding her case has only intensified. ABC recently announced that its fall television lineup will include "*Scamanda*, a docuseries based on the No. 1 podcast of the same name." "'Scamanda' Docuseries Based on Podcast Set for Fall at ABC," *Deadline* (May 14, 2024), https://www.msn.com/en-us/health/other/scamanda-docuseries-based-on-podcast-set-for-fall-at-abc/ar-BB1mmPon. The government's opposition fails to address the important deterrent effect of this ongoing media coverage.

Ms. Riley has demonstrated that there are extraordinary and compelling reasons for a reduction to time served and that the § 3553(a) factors weigh in favor of that reduction.

### III. The Court should grant a 13-month reduction under Amendment 821.

Both Probation and the government agree that Ms. Riley is eligible for an Amendment 821 reduction. *See* SRIR at 2-3; Govt. Opp. at 9:4-6.

Probation recommends that the Court exercise its discretion to reduce Ms. Riley's sentence. SRIR at 3-4. The government, on the other hand, argues that the reduction should be denied. In support of this argument, the government notes that "courts regularly decline to grant sentence reductions to eligible defendants." Govt. Opp. at 9:10-11. It is true that courts frequently deny sentence reductions, but it is equally true that courts regularly *grant* sentence reductions. In the past six months, courts in this district have granted at least 19 publicly filed sentence reductions based on Amendment 821:

| Name | Case Number | Amount of Reduction |
|---|---|---|
| Baldemar Alcazar | CR-15-00481-EJD | Time Served |
| Daniel Barnett | CR-22-00004-YGR | 11 months |
| Jamal Broussard | CR-13-00690-LHK | Time Served |
| Francisco Camacho | CR-17-00520-EJD | 4 months |
| Diandre Cummings | CR-13-00021-PJH | Time Served |
| John Daniels | CR-12-00574-PJH | 17 months |
| Joe Frank | CR-19-00043-YGR | 12 months |
| Jose Garcia Rodriguez | CR-19-00614-PJH | 17 months |
| Fernando Gutierrez | CR-17-00222-EJD | 9 months |
| Adam Herrick | CR-18-00084-WHO | 9 months |
| Jamar Jones | CR-20-00350-VC | 9 months |
| Phillip Leblanc | CR-22-00362-MMC | 6 months |
| Joe Munoz | CR-16-0012-BLF | 12 months |
| Damon Sykes | CR-10-00607-JSW | 26 months |
| Donald Talley | CR-97-40113-JSW | 14 months |
| Kerry Tang | CR-21-00489-RS | 6 months |
| Kenzo Tokuda | CR-17-00517-HSG | 3 months |
| Jesus Manuel Vasquez | CR-19-00608-CS | 13 months |
| Aaron Jamal Woods | CR-21-00478-JST | 11 months |

Moreover, the cases cited by the government bear little resemblance to Ms. Riley's case. In four of those cases, the district court denied the sentence reduction based on the defendant's disciplinary record in prison. *See United States v. Dunn*, 728 F.3d 1151, 1159 (9th Cir. 2013); *United States v. Wilson*, 718 F.3d 50, 53 (2d Cir. 2013); *United States v. Stevenson*, 332 Fed. App'x 261, 263 (6th Cir. 2009); *United States v. Arceneaux*, 297 Fed. App'x 819, 820-21 (10th Cir. 2008). And in the remaining cases, the district court's decision was based on the defendant's history of violent and dangerous conduct. *See United States v. Styer*, 573 F.3d 151, 152 (3d Cir. 2009); *United States v.*

*Marion*, 293 Fed. App'x 731,733 (11th Cir. 2008). Ms. Riley has no history of violence and she has a perfect disciplinary record. *See* SRIR at 3.

The government argues that Ms. Riley has "already benefited from the fact that she had no criminal history since she was sentenced in Criminal History Category I." Govt. Opp. at 9:27-28. There are two problems with this argument. First, the government's approach is irreconcilable with the Sentencing Commission's decision to add USSG § 4C1.1 and to make that provision retroactive. Section 4C1.1 is intended to distinguish between individuals in CHC I who have one criminal history point and those who, like Ms. Riley, have zero criminal history points. *See* USSG App. C (amend. 821, Part B, Subpart 1—Zero-Point Offenders). It is also disingenuous for the government to claim that Ms. Riley received the benefit of being in CHC I, given the Court's upward variance. Ms. Riley's pre-amendment offense level was level 13. Her 60-month sentence far exceeds even the high-end of the advisory guideline range for a defendant in the highest criminal history category. *See* USSG Sentencing Table (providing a range of 37-46 months for offense level 13, CHC VI). Indeed, if the Court grants a reduction to 47 months, the amended sentence will still exceed that range.

Both Probation and the government recommend that any reduction be capped at 4 months, which would result in an amended sentence of 56 months. *See* Govt. Opp. at 10:3-7; SRIR at 3-4. This recommendation is inconsistent with the purpose of a retroactive guideline change, namely, "to give prisoners the benefit of later enacted adjustments to the judgements reflected in the Guidelines." *Dillon v. United States*, 560 U.S. 817, 828 (2010).The 9-month difference between Ms. Riley's proposed reduction and Probation's recommendation is the result of different calculation methods. Ms. Riley uses a percentage-based method to calculate a proportionate upward variance. When this Court sentenced Ms. Riley, it varied upward by approximately 233%. Ms. Riley has requested a reduction to 47 months—approximately 233% above the amended guideline range. Probation uses a months-based method: since the Court varied upward by 42 months from the original guideline range, Probation recommends that the Court vary upward by 42 months from the amended range.

"[I]n general, when calculating the extent of a reduction for eligible defendants, a percentage-based method should be employed." *United States v. Hernandez*, 2015 WL 7573187, *2 (D. Md. Nov. 24, 2015). Indeed, the government frequently advocates for this approach. *See, e.g., id.* ("The

1  Government acknowledges that "although a court need not adhere to one specific method of
2  calculating a sentence reduction, a percentage-based reduction is the most accurate and most
3  consistent means by which to calculate a comparable sentence[.]"); *United States v. Oriakhi*, 2015
4  WL 6774385, *2 (D. Md. Oct. 30, 2015) (noting that the government takes the position that "a
5  percentage-based methodology" will "ensure[] an accurate and consistent sentence in line with the
6  Guideline's policy statement").

7  Not only is the percentage-based method "the most accurate and most consistent," but it serves
8  what the government agrees is the goal of an Amendment 821 sentence reduction: to "reflect 100% of
9  the credit applicable to Defendant's guidelines through a retroactive application of Section 4A1.1(c)
10 while maintaining a variance commensurate with the original sentence." Govt. Opp. at 10:4-5. It also
11 aligns with USSG § 1B1.10's application notes. *See* USSG § 1B1.10, comment. (n.3) (providing
12 examples of sentence reduction calculations, in the context of cases involving substantial assistance,
13 based on the percentage by which the original sentence was above or below the guideline range).

14 Neither the government nor Probation provides any explanation for why Probation's approach
15 is preferable. Probation's only stated reason for rejecting the percentage-based approach its assertion
16 that its office has "consistently recommended reductions in months versus a percentage-based
17 recommendation." SRIR at 3. On the contrary, as Ms. Riley noted in her motion, Probation has
18 used—and courts in this district have adopted—a variety of calculation methods, *including* a
19 percentage-based method. *See* ECF 62 at 14:28-15:7. This Court should do the same here.

## CONCLUSION

21 For the reasons set forth above and in her motion, Ms. Riley respectfully requests that the Court
22 reduce her sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Alternatively, she
23 requests that her sentence be reduced to 47 months based on Amendment 821.

24  Dated: May 20, 2024                    Respectfully submitted,

26                                         JODI LINKER
                                           Federal Public Defender
27                                         _____/S_____
                                           MARA K. GOLDMAN
28                                         DEJAN M. GANTAR
                                           Assistant Federal Public Defenders

REPLY RE: MOTION FOR SENTENCE REDUCTION
*RILEY*, CR 21–00004 BLF